**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION**

| | |
|---|---|
| THE ESTATE OF NAOMI KILLSNIGHT-HIWALKER, ET AL., | **CV-22-18-GF-BMM** |
| Plaintiffs and Counter-Defendants, | |
| vs. | **ORDER** |
| UNITED STATES OF AMERICA, | |
| Defendant, Counter-Claimant, and Third-Party Claimant, | |
| vs. | |
| MIRACLE LOCKWOOD, | |
| Third-Party Defendant. | |

**INTRODUCTION**

Defendant United States of America (the "Government") has filed a motion for summary judgment based on the discretionary function exception and contributory negligence. (Doc. 57.) Plaintiffs ("Killsnight-Hiwalker") filed a combined response in opposition to the Government's motion and cross-motion for summary judgment on the inapplicability of the discretionary function exception. (Doc. 63.) The Government responded to Killsnight-Hiwalker's cross-motion for summary judgment and replied to Killsnight-Hiwalker's response to its motion.

1

(Doc. 78.) Killsnight-Hiwalker replied. (Doc. 82.) The Court conducted a hearing on November 13, 2024. (Doc. 84.)

## BACKGROUND

This case arises from two high-speed vehicle pursuits on the Northern Cheyenne Indian Reservation. (Doc. 1 at 2–6.) The pursuits ended in the deaths of four people and the severe injury of several others. (Doc. 1 at 2.) Killsnight-Hiwalker alleges that in both pursuits, BIA Officers took actions prohibited by governing pursuit policies, directly caused the fatal accidents, and violated the fiduciary duty created by the trust relationship between the United States and Indian Nations. (Doc. 1.) The Government argues that the discretionary function exception immunizes the Government from liability for the BIA employees' actions and that the contributory negligence of the drivers entitles the Government to summary judgment. (Doc. 58 at 2.) Killsnight-Hiwalker argues that the discretionary function exception defense fails as a matter of law, that a contributory negligence defense does not apply to the Government's breach of fiduciary duty, and that material factual disputes preclude summary judgment with respect to the remaining claims sounding in negligence. (Doc. 68 at 28.)

### A. The First Accident

The first fatal pursuit occurred on July 23, 2018. (Doc. 64-2 at 1.) Northern Cheyenne Agency BIA dispatch received two calls about a red pickup truck

driving recklessly on the eastern outskirts of Lame Deer at approximately 4:20 p.m. (Doc. 64-2 at 27, 83, 90.) Dispatch learned the pickup belonged to Naomi Killsnight-Hiwalker. (*Id.*) One caller notified dispatch that "a bunch of kids" were visible in the back of the red pickup. (*Id.*) Lance Limberhand, who watched the pursuit from the roadside, identified the passengers in the back of the pickup as "little boys" approximately seven to ten years old. (Doc. 64-2 at 76.) Dispatchers radioed responding officers, including Lieutenant Randy Elliott, to notify them that children had been observed in the red pickup. (Doc. 64-3 at 2; Doc. 64-2 at 83.) The Government disputes whether officers received this transmission. (Doc. 79 at 5.)

Lieutenant Elliott located the red pickup stopped on the eastbound side of Highway 212 just outside Lame Deer. (Doc. 64-2 at 3.) Lieutenant Elliott pulled in behind the pickup with his emergency lights activated in order to "conduct[] a traffic stop on a vehicle reported to be driven by an intoxicated driver." (Doc. 64-2 at 1, 3.) Officers knew Killsnight-Hiwalker from previous interactions and understood her to be a compliant, nonviolent arrestee. (Doc. 64-1 at 2.) The pickup "took off" in the eastbound lane. (Doc. 59-2 at 2.)

Lieutenant Elliott and Chief of Police Brandon Satepauhoodle-Mikkanen initiated a pursuit of the fleeing red pickup. (Doc. 59 at 4.) Lieutenant Elliott radioed Chief Satepauhoodle-Mikkanen and stated that he intended to pass the red

pickup truck to "try to slow them down." (Doc. 64-2 at 83.) Chief Satepauhoodle-Mikkanen later recalled that he had replied, "copy," to indicate his approval. (Doc. 59-10 at 27–28.) Neither Dispatch nor Chief Satepauhoodle-Mikkanen recorded the Chief's response to Lieutenant Elliott's statement that he intended to pass the pickup in an effort to stop it. (Doc. 59-10 at 28.) Chief Satepauhoodle-Mikkanen testified that the dispatch log must have failed to record this information. (Doc. 59-10 at 28.) Lane Adams, the Government's 30(b)(6) designee, testified that the dispatch log should contain a complete transcription of all radio traffic.  (Doc. 64-5 at 11.)

Lieutenant Elliott drove into the oncoming traffic lane to pass and pulled alongside the red pickup. (Doc. 59-2 at 2.) Lieutenant Elliott estimated that he was traveling 75–80 miles per hour at the time (Doc. 59-5 at 3), but expert testimony based on the available dashboard camera video indicates that Lieutenant Elliott was traveling at speeds closer to 96 miles per hour (Doc. 64-4 at 15). Lieutenant Elliott made eye contact with the driver, whom he recognized as Naomi Killsnight-Hiwalker, as he drove alongside the red pickup. (Doc. 64-2 at 81.) Lieutenant Elliott reported that he pulled back in front of Killsnight-Hiwalker's vehicle "35–50 yards" in front of the pickup. (Doc. 64-2 at 104.) Chief Satepauhoodle-Mikkanen estimated that 20 feet separated Lieutenant Elliott's vehicle and the red pickup when Lieutenant Elliott pulled into the right-hand lane in front of

4

Killsnight-Hiwalker. (Doc. 64-2 at 108.) The expert report indicates that Chief Satepauhoodle-Mikkanen's dashboard camera footage aligns with Chief Satepauhoodle-Mikkanen's estimate of 20 feet. (Doc. 64-4 at 10.)

The maneuver performed by Lieutenant Elliott left Killsnight-Hiwalker with the sole means of escape to drive into the left-hand lane of oncoming traffic. (Doc. 64-3 at 10.) Killsnight-Hiwalker immediately pulled the pickup sharply into the left-hand lane, overcorrected back into the right lane, and lost control of the vehicle. (Doc. 59-9; Doc. 59-2 at 2–3.) Frame-by-frame analysis of Chief Satepauhoodle-Mikkanen's dash cam footage revealed that Lieutenant Elliott's brake lights activated as he pulled in front of the red pickup, immediately before Killsnight-Hiwalker lost control of the vehicle and crashed. (Doc. 64-4 at 6–7.) Lieutenant Elliott reported that he merely took his foot of the accelerator. (Doc. 64-10 at 7.) Call logs and reports from responding Montana Highway Patrol officers indicated that Lieutenant Elliott had "boxed in" the pickup to stop it, and these reports described Lieutenant Elliott's actions as a "boxing maneuver." (Doc. 64-2 at 20–21, 70.) The red pickup rolled several times. (Doc. 59-9; Doc. 59-2 at 2–3.)

Naomi Killsnight-Hiwalker and her brother, Morningstar Killsnight, were ejected from the vehicle and died at the scene. (Doc. 59-4.) The other adult passenger, Shanda LaFranier, also was ejected from the pickup but survived with severe injuries. (Doc. 67 at 10.) The three minor children riding in the backseat,

two of whom were Naomi Killsnight-Hiwalker's children and one of whom was six years old, survived but sustained serious injuries. (Doc. 79 at 17.) Naomi Killsnight-Hiwalker's autopsy showed a blood alcohol concentration of 0.485 and detected methamphetamine, THC, and ibuprofen. (Doc. 59; Doc. 59-2 at 5.) Expert analysis of the crash indicates that the maneuver performed by Lieutenant Elliott would not have allowed an unintoxicated driver sufficient time to react. The expert opined that Killsnight-Hiwalker exhibited a comparable reaction time to an unintoxicated driver. (Doc. 64-4 at 11–14.)

### B. The Second Accident

The second accident occurred on January 4, 2019. (Doc. 67 at 13.) BIA Police Officer Stephen Stallings was parked outside Lame Deer on the eastbound lane of Highway 212. (Doc. 67 at 13.) A maroon Cadillac sedan drove by, traveling at 93 mph in a 65-mph zone. (Doc. 64-20 at 15.) Officer Stallings activated his emergency lights and sirens, but the Cadillac failed to yield. (Doc. 64-20 at 15.) Officer Stallings recognized the vehicle and knew it belonged to Iva Joe Little Head because he had observed the Cadillac parked at that residence. (Doc. 64-20 at 122–23.) Officer Stallings pursued the Cadillac. The Cadillac accelerated to speeds of 110 mph. (Doc. 64-20 at 15; Doc. 67 at 13–14.) Officer Stallings testified that he lost sight of the vehicle for periods of up to ten seconds at a time as it drove over hills and around corners between Lame Deer and Busby. (Doc. 64-8

6

at 4.) Officer Stallings could not recall whether the Cadillac turned off its lights at one point during the pursuit or if he lost sight of it due to the distance between the vehicles. (Doc. 59-6 at 4.) Officer Stallings followed the Cadillac for more than 20 miles. (Doc. 59-6 at 7.)

Officer Stallings reported observing "really light or no traffic" and "maybe one or two vehicles" on the highway (Doc. 64-20 at 118, 124). In fact, Officer Stallings drove past fifteen vehicles during the pursuit. (Doc. 59-6 at 2–3.)  Officer Stallings requested all available assistance and asked that spike strips be placed across the road as he drove into the Crow Reservation. (Doc. 59-6 at 7.)  Crow Agency Lieutenant James R. Tomahawk responded that he would set the spike strips at mile marker eight. (Doc. 59-6 at 7.) Officer Stallings continued to pursue the Cadillac. (Doc. 59-6 at 7.)

Officer Stallings again lost sight of the vehicle as he ascended a hill between mile markers ten and nine. (Doc. 59-6 at 4.) When Officer Stallings crested the hill, he could not "see anything on the road, like any taillights or anything." (Doc. 59-6 at 4.) Officer Stallings slowed down and noticed two vehicle tracks in the snow. (Doc. 59-6 at 4.) Officer Stallings located the Cadillac with the help of another responding officer. The Cadillac had rolled and ejected two of its three occupants. (Doc. 59-6 at 4.)

Officer Stallings testified that he found Miracle Lockwood in the "driver's seat area" of the vehicle after the crash. (Doc. 64-8 at 2–3.) Lockwood crawled out the driver's side window. (*Id.*) Lockwood told Officer Stallings that Nichole Costa was driving. (Doc. 64-20 at 24.) Lockwood reported that she was riding in the front passenger seat with her seatbelt on when the crash occurred. (Doc. 59-9 at 1.) Lockwood survived with serious injuries. (Doc. 59-6 at 3–5.)

Ko. K., one of the children who survived the first accident in the red pickup, was ejected from the Cadillac, partially decapitated, and killed. (Doc. 59-7 at 2.) Nichole Costa also was ejected, received catastrophic injuries, and later died. (Doc. 64-20 at 14.) Hospital tests showed that Nichole Costa had a BAC of 0.072 a few hours after the accident and that she had tested positive for methamphetamine. (Doc. 59-8 at 3.)

### C. BIA police pursuit policy.

The Government's 30(b)(6) designee testified that three sources of material govern BIA police pursuit policy: 1) the third edition of the BIA Handbook (2015); 2) the Department of Homeland Security's pursuit training guidelines; and 3) the Department of the Interior's pursuit policy. (Doc. 64-5 at 2.) The BIA Handbook defines a vehicle pursuit as an officer's "active attempt . . . to apprehend fleeing suspect(s) who know that an officer is trying to stop them, and who have given some indication of the intent not to stop or yield." (Doc. 64-11 at 2.) The BIA

8

Handbook classifies vehicle pursuits as a "use of force" and requires officers to evaluate each pursuit upon the same "objective reasonableness standard" applicable to any other use of force. (Doc. 64-11 at 3.) The BIA Handbook's pursuit policy provides as follows:

> OJS officers should make every reasonable effort to stop traffic violators. The protection of life, both civilian and law enforcement, is the foremost concern that governs this policy. Officers must balance the need to stop a suspect against the potential threat to themselves and the public created by a pursuit or apprehension.

(Doc. 64-11 at 2.)

The BIA Handbook also notes that "[n]o set of guidelines can address all possible circumstances. As a result, officers are expected to evaluate their actions based on whether the potential benefits of their actions outweigh the risks that are involved." (Doc. 64-11 at 5.) The BIA Handbook directs that "[i]n most instances the officer should discontinue attempting to stop the vehicle, unless pursuit guidelines are applicable." (Doc. 64-11 at 3.)

The BIA Handbook contains numerous pursuit policies requiring officers to take certain actions after initiating a pursuit, including instructing that officers "will notify dispatch" of key information, such as the number and description of vehicle occupants. (Doc. 64-11 at 4.) The BIA Handbook casts these directives in mandatory language: officers "will," "must," or "may not" take certain actions. (See generally, Doc. 64-11; Doc. 64-25.) One such instruction mandates that a

supervisor "will immediately terminate the pursuit" when the pursuit fails to comply with the BIA Handbook's "requirements" or when the risks of the pursuit prove greater than the risk to the public created by delaying the suspect's capture. (Doc. 64-11 at 5.) The BIA Handbook directs that during a pursuit, officers "will maintain proper spacing between vehicles to allow proper braking and reaction time in the event that the lead vehicle stops, turns, or slows." (Doc. 64-11 at 5.) The "pursuing officer will terminate the pursuit when he/she loses sight of the fleeing vehicle for any extended period of time." (Doc. 64-11 at 6.)

The Government's Rule 30(b)(6) designee on law enforcement policy and procedure testified that BIA policy does not authorize use of a deadly force maneuver against a vehicle carrying children. "If the officer knows there's three children in the vehicle and the supervisor knows also, they should terminate pursuit." (Doc. 64-5 at 4.) Use of deadly force against a six-year-old child passenger of a fleeing vehicle is prohibited. (Doc. 64-5 at 22.) BIA pursuit policy does not permit the use of a "boxing-in" maneuver, a "tactic designed to stop a suspect's vehicle by surrounding it with law enforcement vehicles and then slowing all vehicles to a stop." (Doc. 64-5 at 2, 12.)

The Department of Homeland Security vehicle training policy, one of the policies governing BIA officer actions in these pursuits, states that "[o]fficers should not attempt to pass the suspect vehicle or pull alongside." (Doc. 64-5 at 7–

10

8.) BIA policy indicates that officers should consider terminating the pursuit if officers lose sight of a fleeing vehicle for "more than a second or two[.]" (Doc. 64-5 at 10.) Chief Satepauhoodle-Mikkanen testified that "[i]f [the driver is] known to us, there's no need to pursue them. We'll simply request a warrant." (Doc. 64-3 at 7.)

## LEGAL STANDARD

Summary judgment proves proper if the movant demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in the non-moving party's favor. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 317, 323 (1986). The Court must enter summary judgment if "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The movant bears the initial burden of informing the Court of the basis for its motion and "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* The movant satisfies its burden when the documentary evidence produced by the parties permits only one conclusion. *Anderson*, 477 U.S. at 251–52. Where the moving party has

met its initial burden, the party opposing the motion "may not rest upon the mere allegations or denials of his pleading, but [. . .] must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 248 (internal quotation marks omitted).

## DISCUSSION

### I.    The Discretionary Function Exception

The Federal Tort Claims Act (FTCA) permits a person to sue the federal government "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). The FTCA imposes government responsibility for damages caused by the "misfeasance of employees in carrying out [the Government's] work." *Dalehite v. United States*, 346 U.S. 15, 24 (1953). The FTCA aims to "establish consistency between the liability incurred by individuals and by the government for the commission of tortious acts." *Faber v. United States*, 56 F.3d 1122, 1124 (9th Cir. 1995).

The discretionary function exception restores government immunity for an employee's acts in "fulfillment of a broad policy-making duty," when the employee exercises or performs a "discretionary function or duty . . .." *Faber*, 56 F.3d at 1124; 28 U.S.C. § 2680(a). This exception applies if "(1) the act or omission on which the claim is based 'involves an element of judgment or choice'; and (2) 'that judgment is of the kind that the discretionary function exception was designed to shield.'"

*Miller v. United States*, 992 F.3d 878, 885 (9th Cir. 2021) (quoting *United States v.*

*Gaubert*, 499 U.S. 315, 322–23 (1991); *Berkovitz v. United States*, 486 U.S. 531,

536 (1988)). The act does not involve an element of choice if the government

employee was "bound to act in a particular way," and the discretionary function

exception does not apply. *Miller*, 992 F.3d at 885. "Where the challenged

governmental activity involves safety considerations under an established policy

rather than the balancing of competing public policy considerations, the rationale for

the exception falls away and the United States will be held responsible for the

negligence of its employees." *Aslakson v. United States*, 790 F.2d 688, 693 (8th Cir.

1986).

The judgment exercised by the employee also must be grounded in broad

policymaking decisions rather than constitute merely a failure to adhere to

professional standards. *Marlys Bear Medicine v. United States*, 241 F.3d 1208, 1215

(9th Cir. 2001). The U.S. Supreme Court explained this distinction:

> There are obviously discretionary acts performed by a Government
> agent that are within the scope of his employment but not within the
> discretionary function exception because these acts cannot be said to be
> based on the purposes that the regulatory regime seeks to accomplish.
> If one of the officials involved in this case drove an automobile on a
> mission connected with his official duties and negligently collided with
> another car, the exception would not apply. Although driving requires
> the constant exercise of discretion, the official's decisions in exercising
> that discretion can hardly be said to be grounded in regulatory policy.

13

*Gaubert*, 499 U.S. at 325 n.7. "If it is a choice to be exercised within established objective safety standards, and the plaintiffs claim negligence in failure to follow such standards, the discretionary function exception does not apply." *Arizona Maint. Co. v. United States*, 864 F.2d 1497, 1504 (9th Cir. 1989).

The district court's decision in *Stearney v. United States* offers a detailed analysis of the factors BIA officers must weigh to determine whether the risk to the public created by a pursuit outweighs the risk of the driver's escape or delayed apprehension. 392 F. Supp. 3d 1037 (D. Ariz. 2019). The district court in *Stearney* determined that the FTCA imposed liability on the United States for "the allegedly improper pursuit" of a driver within the boundaries of the Navajo Nation. *Id.* at 1046. Objective considerations of safety typically do not raise matters of public policy. *Faber*, 56 F.3d at 1125.

The discretionary function exception "applies only to conduct that involves the *permissible* exercise of policy judgment." *Berkovitz v. United States*, 486 U.S. 531, 539 (1988) (emphasis added). The Ninth Circuit analyzed *Berkovitz* and other controlling precedent to understand the difference between decisions grounded in a government employee's consideration of a specific policy and decisions grounded in broader policymaking. *Kennewick Irr. Dist. v. United States*, 880 F.2d 1018 (9th Cir. 1989). The Ninth Circuit concluded that the maintenance and repair of a lamp in a particular lighthouse "could be grounded on economic *considerations*, [but] it

is unlikely that they are grounded in economic *policy* where the government has already decided to maintain the lighthouse." *Kennewick Irr. Dist.*, 880 F.2d at 1024 (original emphasis). The specific considerations involved in maintenance of an individual lighthouse differed from the broad economic policy considerations informing the government's decision to maintain the lighthouse in the first place. *Id.* A government actor's failure to effectuate a policy already made, including the government's adoption of a "specific and mandatory" safety standard, removes the element of discretion. *Kennewick Irr. Dist.*, 880 F.2d at 1026–27 (citing *Camozzi v. Roland/Miller & Hope Consulting Group*, 866 F.2d 287, 290 (9th Cir.1989); *Starrett v. United States*, 847 F.2d 539, 541–42 (9th Cir.1988)).

The Government argues that the responding BIA officers weighed public policy factors and correctly concluded that public safety concerns weighed in favor of continuing the pursuits. (Doc. 85 at 29–30.) Killsnight-Hiwalker argues that the applicable pursuit policies mandate that BIA officers take certain actions. Killsnight-Hiwalker contends that the BIA's objective standard for use of force during a pursuit, though based on several circumstance-specific factors, does not involve the kind of broad policymaking discretion immunized by the discretionary function exception. (Doc. 68 at 28–29.) At this stage, genuine issues of material fact prevent the Court from determining whether the discretionary function applies, or does not apply, as a matter of law.

The analysis of whether the judgment involves the kind that the discretionary function was designed to shield turns on "the nature of the conduct" at issue. *Kennewick Irr. Dist.*, 880 F.2d at 1025 (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 813 (1984)). Like in *Kennewick Irrigation District*, the application of the discretionary function exception relies on whether the pursuit policies governing BIA officers provide a "specific and mandatory" standard from which officers had "no rightful option" from which to deviate. The Government presented some evidence that the BIA Handbook vests BIA officers with the discretion either to continue or terminate pursuits according to their evaluation of competing policy considerations because "[n]o set of guidelines can address all possible circumstances." (Doc. 64-11 at 5.)  BIA policy requires officers to weigh the risks of pursuit against the potential benefits and choose a course of action accordingly. (Doc. 64-11 at 2.) Killsnight-Hiwalker presented evidence, however, that pursuit policies governing BIA officers' actions *mandate* that officers take specific actions and that they failed to take these specific actions in these pursuits.

The parties dispute whether the circumstances of these two pursuits mandated a specific, proscribed course of action and whether the officers' conduct violated that mandate. BIA officers, for instance, "will" maintain proper spacing between vehicles and terminate the pursuit if the officer loses sight of the vehicle

16

for an extended time. (Doc. 64-11.) Killsnight-Hiwalker maintains that Lieutenant Elliott left only 20 feet between the red pickup and his vehicle, but Lieutenant Elliott testified that he believed 35–50 yards separated them. Officer Stallings, similarly, lost sight of the Cadillac sedan for up to 10 seconds at a time, but the parties dispute whether this amount constitutes an "extended period of time," that would require Officer Stallings to terminate the pursuit. The parties dispute the nature of the "boxing-in" maneuver performed by Lieutenant Elliott, whether his supervisor approved the maneuver, and whether the officers knew that the fleeing red pickup carried children. Most importantly, the parties dispute whether these specific directives outweigh the BIA Handbook's more general grant of discretion for officers to "evaluate their actions based on whether the potential benefits of their actions outweigh the risks that are involved." (Doc. 64-11 at 5.) Genuine disputes of material fact prevent the Court from determining as a matter of law whether the discretionary function exception shields the Government from liability and prove more appropriate for resolution at trial.

## II.    Contributory Negligence

The Court turns now to the question of whether the concept of contributory negligence should apply to the drivers in the two accidents.

### A.    The First Accident

Montana law governs the tort issues in this case. *Bear Medicine*, 241 F.3d at 1218.  "Negligence is the failure to use the degree of care that an ordinarily prudent person would have used under the same circumstances." *Peterson v. Eichhorn*, 189 P.3d 615, 620–21 (Mont. 2008). Montana tort law requires a plaintiff alleging negligence to prove the following elements: (1) the defendant owed a duty to plaintiff, (2) the defendant breached that duty, (3) the breach injured the plaintiff, and (4) damages resulted. *Id.*

"[A] plaintiff's contributory negligence may be raised as a defense to a negligence claim." *Larchick v. Diocese of Great Falls-Billings*, 208 P.3d 836, 850 (Mont. 2009). A plaintiff's contributory negligence only bars recovery, however, if the plaintiff's negligence exceeded 50 percent of the fault. *Id.* Summary judgment generally proves inappropriate in negligence and comparative negligence cases due to the prevalence of unresolved factual issues. See *Peterson*, 189 P.3d at 621, 622; *Reed v. Little*, 680 P.2d 937, 940–41 (Mont. 1984). Summary judgment in negligence cases proves "appropriate when reasonable minds 'could not draw different conclusions from the evidence.'" *Walden v. Yellowstone Elec. Co.*, 487 P.3d 1, 6 (Mont. 2021) (internal citations omitted).

Killsnight-Hiwalker offered expert testimony that the maneuver performed by Lieutenant Elliott directly caused the rollover of Killsnight-Hiwalker's vehicle.

(Doc. 64-4 at 17.)  Killsnight-Hiwalker admittedly was intoxicated at the time of the pursuit.  Killsnight-Hiwalker has presented evidence that Killsnight-Hiwalker remained in control of the vehicle until Lieutenant Elliott passed into oncoming traffic, pulled sharply in front of the red pickup, left Killsnight-Hiwalker only 20 feet in which to react, and slammed on his brakes at speeds close to 100 miles per hour. Killsnight-Hiwalker alleges that BIA pursuit policy prohibits these actions due to the danger they pose to officers, fleeing drivers, and the community. Genuine disputes of material fact prevent the Court from determining whether Killsnight-Hiwalker acted more negligently than the Government as a matter of law.

### B.    The Second Accident

"An allegation—other than one relating to damages—is admitted if a responsive pleading is required and the allegation is not denied."  Fed. R. Civ. P. 8(b)(6).  When a party fails to "plead or otherwise defend" the allegations against them, and "that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a).  "The general rule of law is that upon default the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977).  A party's default, therefore, establishes the factual basis for the party's liability. *Geddes*, 559 F.2d at 560.

A party may plead "relief in the alternative or different types of relief." Fed. R. Civ. P. 8(a)(3). A party may plead alternative theories of recovery at the summary judgment stage even when recovery for one theory precludes recovery for the other, provided that the factual allegations underlying the claims are consistent. *NextWave Marine Sys., Inc. v. M/V Nelida*, 488 F. Supp. 3d 1004, 1014–15 (D. Or. 2020). For example, a plaintiff may plead both breach of contract and quantum meruit theories because "the quantum meruit claim becomes relevant only if the contract does not address the services for which recovery in quantum meruit is sought." *NextWave Marine Sys.*, 488 F. Supp. 3d at 1014. The district court in *NextWave Marine Sys.* explained this analysis:

> Defendants also suggest that once at the summary judgment stage, "a party may no longer rely on the alternative pleading." ECF 42 at 9. Defendants' argument is belied by the mere fact that claims for breach of contract and quantum meruit can be tried together. See, e.g., *Kashmir Corp.*, 602 P.2d at 296 (noting that when claims for breach of contract and quantum meruit are tried together, the contract price is the ceiling on recovery even under the quantum meruit count).

*NextWave Marine Sys., Inc.*, 488 F. Supp. 3d at 1014–15 n.1. Incompatible theories of recovery may be pleaded in the alternative as long as the factual basis for both claims "cover[s] the same course of events." *NextWave Marine Sys., Inc.*, 488 F. Supp. 3d at 1014.

The Government filed a third-party complaint for contribution against Miracle Lockwood. (Doc. 25 at p. 20–22.) The Government alleged that "Miracle Lockwood

may have been the driver of the vehicle being pursued" (Doc. 25 at p. 21, ¶ 9); that

Lockwood "had duties to the passengers in the vehicle she was driving" (Doc. 25 at

p. 22, ¶ 14); that Lockwood "violated the standard care and *negligently caused the*

*January 4, 2019 vehicle wreck*" (Doc. 25 at p. 22, ¶ 15 (emphasis added)); and that

"Lockwood's negligence was the cause of the injuries to the other passengers in the

vehicle." (Doc. 25 at p. 22, ¶ 16.) The Government succeeded in serving Lockwood

with a summons on January 16, 2023. Lockwood filed no responsive pleading.

(Doc. 43.) The Government moved for entry of default against Lockwood on

February 12, 2024. (Doc. 47; Doc. 48.) The Clerk entered the default on February

14, 2024. (Doc. 49.) The Government has not yet sought entry of judgment from the

Court to determine damages.

     The Government now argues that "[t]here is no genuine dispute that Costa

was the driver in the second pursuit," and that the entry of default against Lockwood

represents "nothing more than a possibility, a placeholder in the event the

government wishes to pursue contribution against the driver in the second pursuit."

(Doc. 78 at 35.)  A default represents a binding adjudication of a party's liability,

however, not simply a placeholder.  See *Geddes*, 559 F.2d at 560. The Government

did not merely "wish" to pursue a contribution claim against Lockwood sometime

in the future. The Government already has pursued this contribution claim against

Lockwood. (Doc. 47; Doc. 48.)

Moreover, to plead alternative claims for the contributory negligence of both people as potential drivers of the same vehicle would be inappropriate at the summary judgment phase. Unlike *NextWave Marine Systems*, the Government does not plead two separate theories of recovery, but rather two separate, and inherently incompatible, factual bases for that recovery. The Government moved for entry of default that Lockwood's negligence as the driver of the vehicle caused the second accident and the injuries to the other passengers. (Doc. 25 at p. 22, ¶¶ 14–17.) The Clerk of Court granted the default. (Doc. 49.) The Government cannot argue now in seeking summary judgment that Costa undisputably drove the Cadillac in the second accident when it has obtained a default judgment that Lockwood drove the Cadillac in the second accident. The Government likewise cannot claim on summary judgment that no dispute exists that that Costa's alleged negligence as the driver of the Cadillac in the second accident so exceeded that of the pursuing officers as to prevail on its contributory negligence claim. (Doc. 58 at 33.)

Federal Rule of Civil Procedure 11(b)(3) requires parties to have evidentiary support, or the reasonable expectation of evidentiary support, for factual allegations in pleadings. The Court assumes that the Government had evidentiary support to interplead Miracle Lockwood and pursue entry of default against her as the driver of the vehicle in the second accident. The Court further assumes that this evidence of Lockwood driving the Cadillac in the second accident, rather than the Government's

22

desire to establish an "insurance policy" against a potential loss, supports the Government's pleadings.

In any case, whether Lockwood or Costa drove the Cadillac involved in the second accident remains disputed, and this disputed fact remains material to establishing contributory negligence. *Stearney* again proves informative. BIA officers responded to reports that a drunk driver in a truck ran a stop sign and caused a hit-and-run accident. *Stearney*, 392 F. Supp. 3d at 1050. The driver of the truck hit another vehicle during the pursuit, killed three other people and himself, and severely injured another. *Id.* at 1042. The district court concluded that the BIA officer should have terminated the pursuit when all factors either weighed against continuing pursuit or were neutral. *Id.* at 1052. The officer followed the truck "at an average speed of 94 miles per hour for 24.6 miles with his lights and siren activated," even though it was "immediately apparent" that the officer could not overtake the truck while it was moving at more than 100 miles per hour. *Id.* The officer also "knew the truck's owner and suspected, correctly," the identity of the driver. *Id.* at 1051.

The district court in *Stearney* allocated 10% of the fault to the United States and 90% to the drunk driver who hit the plaintiffs' vehicle. *Stearney*, 392 F. Supp. 3d at 1059. These factual determinations rely on the case-specific detail provided by trial. *Id.* Unlike in *Stearney*, the Government has not yet proven the identity of the

23

driver of the Cadillac, whether the Cadillac's driver was impaired at the time of the accident, or whether the driver's actions prove more negligent than the actions of the pursuing officers. Genuine disputes of material fact prevent summary judgment based on the Cadillac driver's alleged contributory negligence.

## CONCLUSION

Genuine issues of material fact exist regarding the applicability of the discretionary function exception and the contributory negligence of the drivers of the two vehicles involved in the accidents. The Court will deny the Government's Motion for Summary Judgment and Killsnight-Hiwalker's Cross-Motion for Summary Judgment.

## ORDER

Accordingly, **IT IS ORDERED** that:

1.    The Government's Motion for Summary Judgment (Doc. 57) is **DENIED**.

2.    Killsnight-Hiwalker's Cross-Motion for Summary Judgment (Doc. 63) is **DENIED**.

Dated this 2nd day of January, 2025.

_____
Brian Morris, Chief District Judge
United States District Court